Filed 2/24/14  In re D.D. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

| | |
|---|---|
| In re D.D. et al., Persons Coming Under the Juvenile Court Law. | C073083 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. Nos. J35568 & J35569) |
| Plaintiff and Respondent, | |
| v. | |
| JENNIFER D., | |
| Defendant and Appellant. | |

Jennifer D. (mother) appeals from the juvenile court's order terminating her parental rights as to minors D.D. and P.D. (Welf. & Inst. Code, § 366.26.)[1]  Mother contends she established that the beneficial parental relationship to adoption applies. (§ 366.26, subd. (c)(1)(B)(i).)  We shall affirm.

---

[1]     Undesignated section references are to the Welfare and Institutions Code.

1

## FACTUAL AND PROCEDURAL BACKGROUND

Mother previously appealed from the August 2012 denial of her section 388 motion seeking to reinstate reunification services. (*In re D.D. et al.* (June 21, 2013, C072125) [nonpub. opn.] (*In re D.D.*).) We draw the facts up to that stage of the proceedings from our prior opinion, of which we take judicial notice.

The Butte County Department of Employment and Social Services (Department) filed section 300 petitions as to D.D. (age 9) and P.D. (age 10) in November 2010, alleging that mother's substance abuse and recent suicide attempt had jeopardized the minors' safety. (*In re D.D., supra*, C072125, at p. 2.) Mother's boyfriend was awaiting sentencing on his latest criminal convictions. (*Id.* at p. 3.)

At the jurisdiction/disposition hearing in March 2011 the juvenile court ordered continued foster placement for the minors and reunification services for mother. (*In re D.D., supra*, C072125, at p. 3.)

Mother and her boyfriend became homeless in June 2011. (*In re D.D., supra*, C072125, at p. 4.) Her progress in services was minimal, and in visitation she related to the minors more as a peer than as a parent. However, mother had previously maintained sobriety and provided structure to the minors for eight or nine years, and had worked at jobs in the social services field. Although the minors had bonded with their foster parents, mother and the minors loved each other and they wanted her to be a parent to them again. In light of these facts, the juvenile court ordered further services at the six-month review hearing. (*Id.* at pp. 3-5.)

At the contested 12-month review hearing, the juvenile court terminated mother's services and set a section 366.26 hearing. Despite a history of domestic violence, mother had remained with her boyfriend until November 2011, when she entered a women's shelter. Even after that, her participation in services was spotty, visitation remained supervised, and she could not provide housing for the minors, who continued to do well

2

in foster care.  An adoptions referral had been completed and the case had been assigned to an adoptions specialist.  (*In re D.D., supra,* C072125, at pp. 4-5.)

In June 2012, mother filed a section 388 petition seeking reinstatement of reunification services and increased visitation, alleging that she had participated in services on her own, regularly attended 12-step meetings, engaged in therapy for codependence and addiction, and completed parenting classes.  Mother's boyfriend, who had been incarcerated since November 2011, was about to be sentenced to prison.  (*In re D.D., supra*, C072125, at p. 5.)  An amended petition added that mother had obtained stable housing and had begun attending Butte College.  (*Id.* at p. 6.)  The juvenile court held a hearing on the amended petition on August 23, 2012.  (*Ibid.*)

Mother testified at the hearing that she had been sober since November 2011, attended Alcoholics Anonymous and Narcotics Anonymous meetings and a recovery program called Stepping Stones, and tested negative for drugs five times since her services were terminated; she had also pursued parenting classes and counseling.  (*In re D.D., supra*, C072125, at pp. 5-6.)  But she had stopped going to Stepping Stones and was not now in therapy because they would have conflicted with her class schedule.  (*Id.* at pp. 6-7 & fn. 5.)  She had not seen her ex-boyfriend since April 2012, but gave him emotional support in June 2012 when his son died.  (*Id.* at p. 7.)  Mother thought visitation went well, but felt frustrated that she could not speak freely to the minors.  She thought they needed therapeutic counseling.  (*Id.* at p. 8.)

The minors' court-appointed special advocates (CASA's) testified that the minors enjoyed mother's visits, but did not want to return to her custody.  (*In re D.D., supra*, C072125, at p. 9.)

The juvenile court denied the section 388 petition because mother's failure to continue with Stepping Stones and counseling and her continued contact with her ex-boyfriend showed her circumstances had not changed enough to justify reinstating reunification services.  However, the court permitted the Department to increase

visitation and to begin therapeutic counseling for the minors if their therapist approved. (*In re D.D., supra,* C072125, at pp. 9-10 & fn. 7.)

The section 366.26 report, filed in August 2012, recommended terminating mother's parental rights and choosing a permanent plan of adoption for both minors. The report stated that the State Department of Social Services' Adoptions Services Bureau had found the minors adoptable and recommended adoption as the permanent plan, but did not attach the bureau's assessment.[2]

According to the minors' counselor, P.D., the older minor, was comfortable with adoption by the current foster family and could accept a decrease in mother's visits after adoption, but was "uncertain about the possibility of being returned to . . . mother." D.D., the younger minor, felt a "deep and meaningful connection with the foster family," and "the presence of a male parental figure in the home [was] very important to him," but he was "emotionally fragile," loved mother very much, and would prefer more frequent contact with her.

Mother's visits remained supervised, due to continuing concerns about her making "inappropriate" statements to the minors which caused them to feel sorry for her, and whispering to them at the ends of visits. She did not believe the minors should be in foster care and remained convinced they would be returned to her, despite the court order

---

[2]  The assessment (originally dated May 2012, but filed with the juvenile court in January 2013) stated: The minors, 11 and 10 years old respectively, were placed together in the foster home where they had lived since removal from mother's custody. They were happy with their caregivers and wanted to be adopted by them, although there was still a bond of love and affection between the minors and mother. The minors enjoyed mother's visits, but the foster mother said the minors had accepted the decrease in visits without a problem. The caregivers were committed to adoption and appeared suitable as an adoptive family, although a home study had not yet been done. They did not want to consider guardianship as an alternative because they feared that mother, who felt a deep sense of grief about the possible termination of her parental rights, would continually challenge a guardianship arrangement.

to develop a permanent plan. She had once confronted the foster mother and accused her of lying. Mother had exhibited a "lack of boundaries" by encouraging the minors to leave school during school hours to meet with her and by establishing residence directly across the street from the minors. She had been terminated from Stepping Stones for noncompliance. She visited her boyfriend weekly in jail and would not say that he would not be a part of her life after he left prison. She had recently been convicted of petty theft and was now on probation for three years. She had not demonstrated that she could meet the minors' needs or provide them a safe and nurturing home.

In August 2012, D.D.'s CASA recommended "adoption or . . . a permanent placement" for D.D. D.D. had made "major progress both academically and emotionally" in the present foster home. Although mother had "made improvements," she was not reliable and stable enough to meet D.D.'s needs.

On August 31, 2012, the juvenile court granted mother's application for a bonding study.

In September 2012, P.D.'s CASA reported that during visits mother persistently revealed her emotions about the future, disregarding the minors' feelings and the visitation supervisor's warnings. The CASA recommended reducing mother's visits.

The section 366.26 hearing, originally scheduled for September 27, 2012, was repeatedly continued to await the bonding study.

The bonding study, dated December 18, 2012, was prepared by licensed psychologist Dr. Dawn Blacker, based on review of case records, psychological testing, and interviews with mother, the minors, social workers, the foster mother, and the minors' older sibling K.D. Dr. Blacker stated that mother and the minors had a strong and positive relationship, and both minors wanted to see mother more often; however, the minors had also established a close relationship with the foster parents and felt "highly conflicted about their future placement." P.D., who was over the age of 12, said he would accept adoption, but would prefer to spend half his time with mother and half with

5

the foster parents. Both minors would benefit from continuing their relationship with mother. Adoption might seriously jeopardize the minors' relationship with mother and be significantly detrimental to their emotional functioning. Despite the minors' wishes to see mother more often, the foster mother felt that after adoption mother's visits should be much less frequent. The benefits of legal guardianship would far outweigh any disadvantages to the minors' wellbeing and permanent stability from not being adopted; therefore, legal guardianship would be preferable to adoption.

On January 3, 2013, relying on the bonding study, mother filed a new section 388 petition, requesting the return of the minors to her custody.

On January 4, 2013, the juvenile court summarily denied the section 388 petition on the ground that the proposed change of court orders did not promote the minors' best interest.

On January 9, 2013, the contested section 366.26 hearing began. Dr. Blacker testified as follows:

Mother did not pose a physical or emotional threat of harm to either minor. There would be no risk in eventually allowing her to have unsupervised visits with the minors, although visits should remain supervised at first because of concerns over mother's previous behavior.[3] It would be appropriate to continue monitoring visits for four to six months.

Older children in dependency cases usually do not want to maintain ties with their biological parents. Given the minors' ages, the strength and quality of their relationship with mother was unusual. The visits between mother and the minors that Dr. Blacker observed went very well; the overall quality of visitation was "extremely positive."

---

[3] Dr. Blacker acknowledged that it could be confusing to the minors and harm their relationship to their foster parents if the minors were put in a permanent plan with the foster parents and then started overnight visits with mother.

6

If the minors were placed in legal guardianship, mother should receive two visits a month for two to three hours at a time, increasing after a while to three visits a month. The foster mother wanted mother to visit only once every three months, which would be detrimental to the minors.[4]

The minors should be engaged in individual therapy at least once a week, preferably with different counselors. Both were "extremely shut off and disconnected" during interviews; D.D. cried half the time during his interview. They needed help to talk about their feelings. Furthermore, according to their behavior questionnaires, D.D. was at risk for "aggression, conduct problems, anxiety, and depression"; P.D. was at risk for aggression.[5] Three to five sessions of family therapy with mother and the minors together would also be desirable to address the minors' concerns about being separated from mother and no longer in her care.

Termination of parental rights and adoption would be detrimental to the minors because the likelihood of continuing contact with mother was extremely low, and the detriment of severing that relationship outweighed the benefit of permanency. The benefits of legal guardianship would outweigh the benefits of adoption.

Dr. Blacker did not directly assess the bond between the minors and the foster parents, but it appeared "positive and strong." If mother's visitation were increased, it could affect the minors' ability to bond with the foster parents. There was a risk that continued contact with mother could impact the minors' ability to have permanence with that particular foster family. Mother had "struggled" with the idea of allowing the foster

---

[4]     Dr. Blacker admitted that her report stated that the foster mother wanted visits only every four months, and that it was "possible" she had a bias against the foster mother. She denied that she actually had such a bias, however.

[5]     Dr. Blacker conceded that the scales on the questionnaires did not reveal "clinically significant" risk levels for either minor.

parents to act as the minors' actual parents; however, Dr. Blacker thought mother would be able to accept this idea in the future.

Dr. Blacker acknowledged that social worker Yvonne Johnson supported adoption as a permanent plan, partly because of the strained relationship between mother and the foster mother, and considered legal guardianship undesirable.[6] Dr. Blacker also acknowledged that Allison Juers, who transported the minors to visits, favored adoption and permanency for the same reasons.

Called as a hostile witness by mother, Johnson testified that she was assigned to the case in March 2012 after reunification services ended. She had considered legal guardianship as well as adoption, but finally preferred adoption because she thought mother would "challenge guardianship and sabotage permanency." Mother continued to discuss placement and termination of parental rights with the minors, creating a conflict of loyalties for them.

From Johnson's discussions with the foster parents, she believed that after adoption they would permit future contact between mother and the minors if the minors wanted it and mother could behave appropriately during visits. Johnson had concerns about increasing contact as Dr. Blacker recommended, because previous discussions with mother had not caused her to stop saying inappropriate things and breaking down emotionally during visits. Largely relying on the adoptions assessment, Johnson thought adoption would provide more permanency and be healthier for the minors than legal guardianship.

Before the section 366.26 hearing resumed, the Department submitted a status review report dated February 14, 2013. The report stated that visitation remained

---

[6]    As evidence of the strained relationship, counsel cited an incident in which mother followed the foster mother into her driveway in a car, and another in which mother called the foster mother a liar. Dr. Blacker did not deny that these incidents occurred.

8

supervised "due to [mother]'s inability to demonstrate emotional stability and appropriate boundaries during visits." The foster family was "traumatized" by mother's behavior over the last two years and would not consider a guardianship for fear of mother's continued harassment. Mother still refused to accept that foster placement was necessary, did not support permanency planning for the minors, and had made clear that only their return to her care would satisfy her; she completely failed to understand that they needed a stable home life. The minors had not received further counseling and were not interested in doing so; they had shown no behavioral problems suggesting emotional instability. With the foster parents' approval, the foster family agency was arranging for supervised visits, paid for by the agency, for one year if the minors were adopted.

On February 26, 2013, the next court date for the section 366.26 hearing, Dr. Blacker testified that she had now read the adoptions assessment (not yet filed with the court when she prepared her study or when she previously testified), and it did not change her opinion in any way. The assessment's statement that the minors wanted to remain with the foster parents and be adopted by them was inconsistent with what the minors had said to Dr. Blacker in interviews subsequent to the assessment; at that time they wanted more ongoing contact with mother and were "very ambivalent" about adoption. From what the foster mother had told her, Dr. Blacker continued to believe that the foster mother would oppose increasing visitation and contact by mother after adoption. In response to questioning by the juvenile court, Dr. Blacker opined that the minors' reluctance to speak about their feelings and wishes stemmed from protectiveness toward both mother and the foster parents.

After hearing argument from counsel and taking the matter under submission, the juvenile court ruled on February 28, 2013. The court stated:

"The Court did review the material that was referenced on the 26th and considered the testimony. The Court is mindful that at the time of the initial 26 report, which was filed on August 10th, 2012, there's reference there about valuations of mental and

9

emotional state of the children . . . . With respect to P[.D.], that he was asked about his feelings on adoption. That he enjoys the visits the way they currently were established. He believed decreasing visits after adoption was acceptable. He was comfortable with his current family. Uncertain about the possibility of return to his mother. D[.D.] presented as emotionally fragile, and there was not much discussion there. The Court also is mindful that the children have been in the same placement since their removal. The visits had been going well for the most part with the mother, and that decreased during the period of time of preparing for permanency after April of 2012.

"Thereafter the reports reflect the concern about inappropriate comments made by mother to the children in April and July of that year. The adoption assessment was apparently authored in May, filed in January[,] though, of this year. But in that assessment it did say that the boys were comfortable with the visits with their mother and happy with the idea of adoption, and the reports reflect subsequently meeting with mother to discuss the permanency [and] that mother was extremely emotional with the intent to contest the plan of adoption. And the social worker's report details some of the presentation by mother of involvement in services that either didn't come to fruition, or were not entirely accurate.

"Then by the time the children were interviewed in November by Dr. Blacker, it appears to the Court the children were conflicted and emotionally guarded and uncertain as to their feelings either way about adoption or living with their mother. And that appears to the Court to be the derivative effect of the length of the proceedings and the repetition of inquiry on the subject and the age of the children.

"The Court . . . does feel that mother has not met her burden such that the Court would forego the plan of adoption, which is recommended for the permanent plan for the children. The Court views the children's expression of concern and affection for their mother, but does not see that there is substantial evidence that would support a finding of detriment to the children if the Court were to terminate the parental rights.

10

"The Court is not persuaded that the benefit to the children and the relationship they have with their mother is a substantial, positive, and emotional one such that it would outweigh the benefit they would receive from adoption. That is from the permanence that adoption brings particularly in this setting where the children have been in the same place since removal. They are together as siblings, they have access to other siblings. Their needs are met, they're thriving in school, and it is reflected in the reports that the foster parents and [pro]spective adoptive parents understand the importance of post adoptive contact with their mother.

"So the Court is going to follow the recommendation that is presented by Children's Services with respect to the 366.26 report filed in August . . . 2012."[7]

The court thereupon terminated the paternal rights of mother and the alleged fathers and referred the minors for adoptive placement.

## DISCUSSION

Mother contends the juvenile court erred by finding she had not established the beneficial parental relationship exception to adoption. We disagree.

" 'At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]' [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.)

Under certain limited circumstances, the court may find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child . . . ." (§ 366.26, subd. (c)(1)(B).) One of these is the beneficial parental relationship exception,

---

[7]     The juvenile court then orally denied mother's section 388 petition dated January 3, 2013.

11

under which the parent has the burden of showing that he or she has maintained regular visitation and contact with the child, and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); *In re C.F.* (2011) 193 Cal.App.4th 549, 553 (*C.F.*).) The benefit to the child must promote the child's "well-being . . . to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*); accord, *C.F., supra*, 193 Cal.App.4th at p. 555.) Even frequent and loving contact is not sufficient to establish this benefit, absent a significant, positive, emotional attachment between parent and child. (*C.F., supra*, 193 Cal.App.4th at p. 555; *Autumn H., supra,* 27 Cal.App.4th at p. 575.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1350 (*Jasmine D.*).)

As the parent must establish the existence of the factual predicate of the claimed exception, and the juvenile court must then weigh the evidence and determine whether it constitutes a compelling reason for determining detriment, substantial evidence must support the factual predicate of the exception, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re K.P.* (2012) 203 Cal.App.4th 614, 622; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315.)

"On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*Autumn H., supra,* 27 Cal.App.4th at p. 576.) " '[E]valuating the factual basis for an exercise of discretion is similar to analyzing the sufficiency of the evidence for the ruling. . . . Broad deference must be shown to the trial judge.' " (*Jasmine D., supra*, 78 Cal.App.4th at p. 1351.)

It is not disputed that mother maintained regular visitation and contact with the minors and that mother and the minors had a close and loving relationship. Therefore, we focus on the second prong of mother's burden: whether she established a compelling reason to find that the detriment to the minors from severing the parental relationship would outweigh the benefit of stability and permanence to the minors from adoption by their current foster family. Viewing the evidence most favorably to the juvenile court's ruling, we conclude mother did not do so.

Given the Legislature's strong preference for adoption, where adoptable minors are placed with a prospective adoptive family to which they have bonded and which meets their needs, that almost ends the discussion. (*Jasmine D., supra*, 78 Cal.App.4th at p. 1350.) Such is the case here. The minors have lived with their foster family since the dependency began, over two years ago. The foster parents wished to adopt and were well qualified to do so. They consistently met all of the minors' needs. The minors were closely bonded to the foster family, performed very well in school, and showed no significant emotional disturbance. With one exception, everyone professionally involved in the latest stages of the case thought adoption was the best plan, not only because it gave the minors permanence and stability but because mother's conduct and attitude up to the time of the hearing aroused fear that she would challenge any other arrangement if she retained the right to do so. Although the minors seemed ambivalent about adoption, they did not oppose it, and the juvenile court reasonably assessed their ambivalence as

13

partly due to how long the proceedings had already lasted and partly due to the emotional pressure unfairly put on them by mother.

It is true that Dr. Blacker dissented from this consensus, but the juvenile court was not required to give her opinion great weight. She was mother's hired advocate. Her bonding study did not study the bond between the minors and the foster parents. Though denying bias, she construed the evidence most favorably to mother and most unfavorably to the foster family. On the one hand, she interpreted the foster mother's ambiguous statement about increased future visitation and contact as proof that the foster mother would oppose them, regardless of the surrounding circumstances. On the other hand, she dismissed mother's documented hostility to the foster family and to any future plan that did not include getting the minors back by speculating groundlessly that mother's attitude was bound to change. Finally, Dr. Blacker's recommendation of legal guardianship discounted both the statutory preference for adoption and the evidence that mother would refuse to respect the foster parents' authority as legal guardians.

Mother asserts that this case is like *In re Amber M.* (2002) 103 Cal.App.4th 681 (*Amber M.)* and *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), where appellate courts found that the beneficial parental relationship exception to adoption had been established. We disagree.

In *Amber M.*, all the experts except the social worker agreed that the mother's relationship to the children was so close and beneficial that it would cause the children detriment to terminate the parental relationship, and she had done virtually everything asked of her to regain custody; the social worker, the only dissenter, "provided no more than a perfunctory evaluation of Mother's relationship to the children." (*Amber M., supra*, 103 Cal.App.4th at p. 690.) Here, the experts, except for Dr. Blacker, favored adoption and set forth detailed reasons why adoption was in the children's best interests.

In *S.B.*, the juvenile court found that the father had fully complied with his case plan and the minor (much younger than the minors here) would benefit from continuing

14

her relationship with him, but the court terminated parental rights because the minor had a strong relationship with her caretaker, who promised to allow continued visitation; the appellate court held that these were insufficient grounds to terminate a genuinely beneficial parental relationship. (*S.B., supra*, 164 Cal.App.4th at pp. 293, 298-301.) By contrast, mother here had not done everything asked of her to regain custody; nor was her relationship to the minors purely beneficial. Unwilling to accept the fact that she would not regain custody, she put improper emotional pressure on the minors, trying to make them feel torn between her and the foster parents, whom she repeatedly challenged and whose authority over the minors she refused to respect.

Under all the circumstances, *Amber M.* and *S.B.* do not support mother.

## DISPOSITION

The order terminating parental rights is affirmed.


    BLEASE    , Acting P. J.


We concur:


    NICHOLSON    , J.


    DUARTE    , J.